F3a1cruh

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                          15-mj-706

JONATHAN ROSS CRUZ,

                Defendant.                Bail Appeal Hearing

------------------------------x

                                          New York, N.Y.
                                          March 10, 2015
                                          3:18 p.m.


Before:

                  HON. GREGORY H. WOODS,

                                          District Judge


                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  SHAWN G. CROWLEY, ESQ.
     Assistant United States Attorney

STEVE ZISSOU, ESQ.
SALLY BUTLER, ESQ.
     Attorneys for Defendant


ALSO PRESENT:  AARON SPEVACK, Special Agent, FBI

ALSO PRESENT:  KEYANA POMPEY, Pretrial Services Officer

F3a1cruh

(Case called)

THE DEPUTY CLERK:  Counsel, please state your names for the record.

MS. CROWLEY:  Good afternoon, your Honor.  Shawn Crowley for the government.  With me at counsel table is Special Agent Aaron Spevack from the Federal Bureau of Investigation and two officers from pretrial services.

THE COURT:  Thank you.  Good afternoon.

MR. SPEVACK:  Good afternoon.

MR. ZISSOU:  Good afternoon.  Mr. Cruz is represented by Steve Zissou and Sally Butler, and we're all before you.

THE COURT:  Thank you.  Good afternoon.

MS. BUTLER:  Good afternoon.

THE COURT:  And good afternoon to you, Mr. Cruz.

THE DEFENDANT:  Good afternoon.

THE COURT:  So I understand that this proceeding has been requested by the United States, which has an application with respect to Mr. Cruz's proposed bail release conditions.

MS. CROWLEY:  That's correct, your Honor.  Your Honor, the government is appealing the bail decision set by Judge Peck on Friday.  This defendant has been charged with the production, receipt, and possession of child pornography.  He has admitted that he's been engaging in this conduct for years. There is simply no condition or set of conditions that will assure that he does not continue this behavior if he is

F3a1cruh

released on bail or that he will appear in court.  Thus, pretrial detention is necessary.

Backing up just a bit, as the court is aware, under 18 U.S.C. Section 3142(e), because of the crimes charged in this case, there is a statutory presumption of detention.  That means that there is a presumption that the defendant poses a danger to the community and a risk of flight.  The defendant cannot be released unless he has rebutted that presumption. The government submits that the defendant has not and cannot rebut it.

To determine whether the presumption has been rebutted, the statute directs the court to consider three things: first, the nature and circumstances of the offense charged; second, the history and characteristics of the defendant; and third, the nature and seriousness of the danger to the community and the victims if the defendant is released. Considering these factors, the defendant is both a danger to the community and a risk of flight, and no conditions, even the conditions of bail set by Judge Peck, will rebut that presumption.

First, as to danger of the community, your Honor, this is not a case involving the mere passive possession of child pornography.  This is a production case involving a high school teacher who has been for years paying students to send him pornographic photographs of themselves.  The conduct is

F3a1cruh

egregious, both because of what the defendant has done and because of who he is.  As outlined in the complaint, the defendant has been committing these crimes mainly from his mobile telephone and from his computer, from his home, from his school, and while he was traveling on weekends at debate tournaments.  He is using a fake identity -- both a fake name and photographs of one of his former students -- to lure children in, gradually build a relationship with them, and then, for those who seem receptive, engaging in sexually explicit chats.  The defendant then pays students tens of thousands of dollars, by his own admission, to send him photographs of themselves.  He asks the victims for photographs of their crotches, of their feet, and of their flexed muscles. He tells them to stand in front of a bathroom mirror and to pose in their bed.  And then, in many cases, the defendant asks for and receives pornographic images of the minor victims. Indeed, as stated in the complaint, the agents found at least 30 such pornographic images in a very cursory review of the defendant's computer on Friday.  Since that time the agents have searched Mr. Cruz's phone and have found even more, including two additional victims that were not even known about at the time the search was conducted.  The defendant commits these crimes from his phone and from his computer while he is at home.  There is simply no way to monitor his behavior, even under the conditions set by Judge Peck.  There is simply no way

F3a1cruh

to be sure that the defendant does not get another phone, does not get a computer, and start this right back up again. Indeed, your Honor, the defendant told the agents on Friday that he has been doing this for years, that he has known it is illegal and wrong all along, that he has been trying to stop himself, and that he has been unable to.

The office's experience is that in these types of cases it is very common for defendants to violate while on supervised release because of the nature of the crimes and because of the way that they commit them. Indeed, in the last six months, this office has had two cases where defendants were on pretrial supervised release under conditions very similar to those imposed here, including electronic monitoring, home detention, and no access to computers or mobile devices, and the defendants violated. They somehow accessed mobile devices or computers that were unknown to pretrial, and they engaged in chats and production again. Indeed, courts in this circuit have frequently found that no conditions can appropriately monitor a defendant who has been charged with producing and receiving child pornography on a telephone or a phone. Judge Bianco, in a recent opinion, *United States v. Valerio*, held, "There are no conditions that can address the grave danger posed by defendant's access to electronic devices such as computers and mobile phones." He wrote further, "By the click of a computer key or a tap of a touchscreen on a mobile phone,

F3a1cruh

a defendant could cause the same type of extreme harm to children and to the community that he is alleged to have committed in the instant case."

Your Honor, this defendant has been chatting with dozens of students throughout the last few years. He has been committing these crimes from his home, from his computers, and in addition, as the FBI has learned in the last few days, the defendant has been chatting with actual students of his. They have found on his phone chats indicating that the defendant has been soliciting pictures from these students and that the students have been traveling and visiting Mr. Cruz at his home. There is no way to be sure that we can prevent students or other people from traveling to Mr. Cruz's residence or any other place where Mr. Cruz may be in pretrial monitoring and either bringing him a phone or starting this back up again.

As to risk of flight, your Honor, the defendant faces a very significant sentence. Just on the conduct charged here, he faces a 15-year mandatory minimum on the production count. His guidelines on that count alone are 180 to 180 months. This provides him an enormous incentive to flee. The strength of the government's case is overwhelming. In addition to the defendant's full confession on Friday, the government has, among other things, statements of victims who chatted with and sent photographs to Mr. Cruz; the chats and the photographs themselves that the agents have found on Mr. Cruz's phone and

F3a1cruh

on Mr. Cruz's computer; IP logs showing that Mr. Cruz was logging into his kick accounts from locations where the kick accounts were sent, from his phone, from his house, from the school, and at debate trips.

Your Honor, the defendant has enormous incentive to flee, even under conditions set by Judge Peck, even under electronic monitoring, which we know is a vast improvement but it's not failsafe. The government submits that the defendant poses both a danger to the community and is a risk of flight and therefore should be detained. Thank you.

THE COURT: Thank you.

I want to hear from defense counsel, but can I ask you, Ms. Crowley, to please expand on your assertion that there is no way to ensure that the defendant will not have access to a telephone and the internet. Judge Peck, as you know, ordered that the defendant have no access to computers. On the transcript he made it clear that he was not to have access to smartphones. Why do you state conclusively that there is no way to prevent him from having access to the internet or other means of communication?

MS. CROWLEY: Because, your Honor, there's no way to prevent anyone from accessing Mr. Cruz's apartment or wherever he is and bringing him a mobile device. There's no way to prevent Mr. Cruz from -- even under electronic monitoring, defendants are permitted to go out and go food shopping or do

F3a1cruh

whatever they need to do -- from picking up a phone or a mobile device on those occasions. There's also no way to prevent the students and the minors that Mr. Cruz knows and has been in contact with from coming to Mr. Cruz's residence, from calling Mr. Cruz. I believe, from what the agents have told me, Mr. Cruz has a landline in his residence. I believe, actually, a landline is necessary even to set up electronic monitoring. There's just no way to prevent him from getting these devices and from starting up again.

THE COURT: Thank you.

MS. CROWLEY: Thank you.

THE COURT: Counsel?

MR. ZISSOU: Judge, if I might, I think a reading of the government's argument --

THE COURT: Can I do one thing first, just to set the table.

MR. ZISSOU: Sure, yeah.

THE COURT: As Ms. Crowley said, this is a presumption case, and therefore, albeit limited, you bear the burden of production of evidence to rebut the presumption. If you do so, then the burden, which always remains with the government, will be to persuade me that no condition or combination of conditions will assure the appearance of the defendant and the safety of the other persons in the community. So just to frame the conversation, in order to proceed, I would first need to

F3a1cruh

hear from you, and I'll ask you to make it clear that you're doing so and what the evidence is that you are proffering to me to rebut the presumption of both dangerousness and flight risk established by the statute.

So with that frame, could you please proceed.

MR. ZISSOU:  Well, your Honor, I think, as the magistrate judge implicitly found in his bail decision, that in this particular case, the package of conditions that were suggested by the pretrial services agency overcame that presumption.  One of the reasons why -- and, Judge, I apologize for the lateness of the submission, the letters that we sent to you today, but we only learned late Sunday that the government intended to appeal the decision.  It wasn't until Monday afternoon that I asked the family to reach out to some of the folks who had been calling, a great many of them, asking how they could lend their support.  It was less than I think 24 hours later that we had 40 letters from folks in the community. And I think that's where this case turns.

There is more to Jonathan Cruz than what's in the complaint.  He has, first and foremost, a tremendously deep set of roots and family in the community.  He's an American citizen, born in the United States.  He's lived in this community his entire life.  A block away from his apartment lives his grandfather and other members of his family.  In another direction a cousin lives.  Out on Long Island where his

F3a1cruh

mother lives, numerous other members of the family live.  So as a threshold matter, this is a young man with deep roots in the community, as reflected in the letters that you received.  And those letters, I point out -- I know that your Honor just got them -- they didn't just come from folks who were here in the New York area.  Some of the letters came from -- well, for example, there was a letter from Sarah Heaton, a former co-worker who used to work with Mr. Cruz, and she wrote from Franklin, Tennessee, as far away as that, and she wrote a number of things that I'm sure your Honor has probably read.  I won't belabor the record with that.  Some of the letters come from Florida.  Some of the letters come from Vermont.  They come from all over the United States, people who know him, who understand what the allegations are and nevertheless appreciate that this man is more than the 17-page complaint that was filed in this case.

So he has no criminal record.  This is the first time he's ever appeared before a court.  And what he's proposing and what pretrial found was sufficient was, frankly, a substantial bond.  A million dollars is hardly a small bond.  And they essentially asked the court to impose every condition that the Bail Reform Act recognizes.  There was only one that was left out that I could find, and that is the condition that an individual take custody of him -- family member, friend -- and there are a number of people in his family, his parents, of

F3a1cruh

course, who would gladly accept the custodial responsibility that the Bail Reform Act contemplates.

And so Mr. Cruz is hardly -- well, let's say this. If anyone is going to get released on a case such as this, it would be Jon Cruz. An alternative reading of the statute, as I think the government has made in this case, is that no one could ever be released if they're charged with this offense because there are no conditions, as they say, that could ever be sufficient to protect the community. But that can't be a proper reading of the Bail Reform Act. It can't be a proper reading of the Adam Walsh Act. Both statutes can simply say, if someone's charged with this kind of offense, they can never be released; courts, whether they're magistrate judges or district judges, do not have the statutory authority to enter release orders. But that's not what either statute says. Indeed, as the magistrate found, he was a bondable individual and the package of conditions that were suggested were sufficient. Frankly, I think they're more than sufficient.

And so, look, Magistrate Judge Peck has been a magistrate judge in this district for 20 years. I think it's fair to say that the magistrates have what I'll call an institutional advantage over the district courts. They see more of these cases, they do more arraignments. Certainly the pretrial services agency has made their recommendation. They reviewed this and they stuck with the original recommendation

F3a1cruh

they made, which is that he can be released on condition.  So while I appreciate the government's argument and their concern, simply because two unrelated defendants violated the terms of the conditions of release cannot be a factor on which this man is denied bail.  He is presumptively innocent, as we know.  He has every right to show that he can both satisfy the conditions that the court has set and abide by them, which, again, as I say, is something both the pretrial services agency, having taken not just one look but a second look at it -- and with the new information that the government has brought to the court's attention today, I don't think that would have changed Magistrate Judge Peck's position.

But there's one final thing I will add, Judge.  The government has been investigating this case for some time. There is not a single allegation that any minor individual was touched in any way.  No one, no minor individual, no minor child was accosted, abused, or in any way subject to any other kind of touching, criminal offense.  Simply no evidence of that.  And there is no evidence of that because, frankly, Judge, it just never happened.

Now, look, I've seen a number of these kinds of cases, and at this point in the proceeding I'm reluctant to sound like I'm trying to minimize it.  I'm really not.  But I have to say something else that goes toward dangerousness and not toward the seriousness of the offense, which I do not dispute.  It's

F3a1cruh

obviously a serious offense.  At least Congress has defined it as such.  But the court should keep in mind that the teenagers who sent the photographs did so voluntarily.  Now I understand that's not a defense.  I don't suggest that that's a defense.  And I'm not trying to suggest it as any way a mitigating factor.  But it does go to the question of dangerousness.  These are not teenagers who were compelled, forced, in custody, as I suspect Congress meant the production statute to apply to.  None of these individuals, none of these teenagers who sent the photographs or who were alleged to have sent the photographs were forced to do so.  And again, nor is there anyone, I believe the government's investigation reveals, that was forced in that way.  And so again, as a defense lawyer, we have to be careful about making it sound like we're blaming someone.  We're not.  I'm simply saying that in determining whether or not there is a risk of danger to the community and the weight of the evidence that suggests there's a danger to the community, that's a factor the court can take into consideration.  These were voluntary communications.  They were not compelled.  I understand there's an allegation of the payment of fees.  There is a market, if you will, of teenagers who voluntarily, in exchange for money, engage in this kind of behavior.  I'm not saying it's right.  I'm not saying Congress shouldn't punish it accordingly.  But the courts should take that into consideration simply insofar as the danger to the

F3a1cruh

community is suggested.

And so for all of these reasons, Judge, I would ask you to give due deference to the decision of the magistrate judge and impose the same conditions. Frankly, I have no objection to including as a condition -- the attorneys for the government and I discussed this earlier -- including as a condition that one of his parents take custodial responsibility for him. I certainly have no objection to that being an added condition and require that he reside with them. I've spoken to them, and they gladly accept that responsibility.

THE COURT: Thank you. Can I confirm with you, sir, that you have received the most recent version of the pretrial services report, which I think was updated immediately before this conference.

MR. ZISSOU: Yes, I have.

THE COURT: Thank you.

Ms. Crowley, do you have any rejoinder to counsel's comments?

MS. CROWLEY: Just a few quick things, your Honor, in light of what defense counsel has said.

THE COURT: Thank you.

MS. CROWLEY: First of all, Judge Peck was not aware at the time -- no fault of his own, just because of what we've uncovered in our subsequent investigation -- of some pretty significant facts.

F3a1cruh

First of all, as I stated earlier, agents have found on Mr. Cruz's phone pornographic images of at least two additional victims that we didn't even know about before. In addition, as I stated before, the agents have found on his phone chats between Mr. Cruz and students indicating that he was asking for photographs of them, nonnude photographs, and that they were traveling to his house.

Second of all, the government has no doubt that the defendant has made a tremendous impact on the debate community and that he's done some wonderful things at Bronx Science. We have no doubt, and that's fully represented in the letters submitted this morning. However, that's one side of the defendant. The other side is that he's taken what he knows of 14- and 15-year-old boys from teaching them every day and understanding their psyche and understanding how to talk to them and how to engage them in conversations and how to groom them over time to trust him and to send him pornographic photographs. I take issue with the characterization that these boys were sending these photographs voluntarily. Certainly no one was holding a gun to their head, but first of all, they were paid for the photographs, and second of all, there are several chats that the FBI has looked at where Mr. Cruz has asked for these photographs, the boys have been extremely reluctant, extremely hesitant, and he has persisted, by compliments, by flattery, and even by insults: "You don't

F3a1cruh

trust me.  What's going on?  I'll send you more money.  What do I have to do?"  To say that that's a voluntary sending of photos from a 14- or 15-year-old, I don't think that's right by any stretch of the imagination.

In addition, your Honor, in the course of their investigation, which started in December of 2014, the FBI and other law enforcement agencies, as the complaint states, had a chance to sit down with several of the victims in New Mexico. The victim who sent Mr. Cruz some nude photographs, they've met with him twice.  Both times they have relayed that the victim is distraught, that he has dropped out of his sports team, that his grades have suffered, that he is not the child that he once was.

These are real victims.  These are victims who will be in danger if Mr. Cruz is let out today or this week, and the government submits that for this reason, detention is the only appropriate course of action here.  Thank you.

THE COURT:  Thank you.

MR. ZISSOU:  If I might just beg your indulgence for a moment.

THE COURT:  Yes.

MR. ZISSOU:  There were letters that were sent to your Honor, I mentioned before.  I have to just, if I might, read from one.  This is the mother of a student at the Bronx High School of Science.  And she describes the effect that Mr. Cruz

F3a1cruh

had on not simply her son but so many of the other students in that school. The mother of a student. And I'm not going to mention her name, but she goes on to say, "I do not condone this behavior." But she continues, "but this man is not a monster. He may need help, and I would hope he would be able to have therapy, not punishment. There is a lot of prejudice against gay people in the world. He does not deserve a brutal ending, a mandatory sentence, or the ruination of his life. Not this man, who has helped so many young people grow and flourish. Not this man, who has always been, in his own spirit, so young and cheerful. Working in a public school is a challenge for anyone, and so few truly gifted people choose this career when they could do anything. Jon chose to help young people, and his efforts are beyond extraordinary." This is from the mother of a student who went to the high school, a mother who's fully aware of the allegations but understands that there's more to this man than the 17-page complaint, one that cries out to this court, urging you to release him on conditions so we can begin to put his life back together and this case can be resolved in that way.

I should add, too, because of all the publicity in this case, he doesn't have the privilege of being in general population. He's in selected population. He's in the SHU. It's 24-hour-a-day lockdown. When he got to the facility, he advised them that there was publication of his case and he

F3a1cruh

might be in danger, and after considering the matter, the folks at the MDC agreed that he might be in danger so he has been in 24-hour-a-day lockdown on the ninth floor, segregated among all of the terrorists and other individuals that this district prosecutes so prominently, and that's where he will remain if he's not released, in 24-hour-a-day lockdown, separated from his family, separated from general population.  It is not the place where this man should be.  The conditions are strict enough, your Honor.  He should be released.

THE COURT:  Thank you.

Ms. Crowley, anything else?

MS. CROWLEY:  Extremely briefly, your Honor.

THE COURT:  Please continue.

MS. CROWLEY:  Just to the letters that were submitted this morning, I have to add that the FBI has a hotline that they've put up on Friday when this went public and they have received letters and they have received calls indicating the opposite of what counsel just said, from parents, from students.  I don't really want to say much more about that, given the sensitivity of the investigation, and I certainly don't want to reveal the identity of potential victims, but I thought the court should be aware of that.

Thank you.

THE COURT:  Thank you very much.

I would like to take a few moments to gather my

F3a1cruh

thoughts and consider the arguments of counsel before returning to render my decision with respect to the application, so if you'll excuse me.  You can step out or away, but please expect to be back no later than 4 p.m.  Thank you.

MS. CROWLEY:  Thank you, your Honor.

THE DEPUTY CLERK:  All rise.

(Recess)

(In open court)

THE COURT:  Counsel, thank you for your presentations. I have not yet decided how I'm going to rule on this.  I'm going to say that I'm considering the prospect of releasing Mr. Cruz on the conditions described by Judge Peck and some additional conditions, including the requirement that his parents take custody of him.  In order for me to assess the feasibility of that option, however, I want to hear from the parents to assure myself that they're capable of undertaking that task, that they understand what it means, and to give them the opportunity to assure me that Mr. Cruz will appear and that he will not pose a risk of danger to the community.

Counsel?

MR. ZISSOU:  Yes, of course, Judge.  Did your Honor want to hear from them now?

THE COURT:  Please.  Call them forward, one at a time.

Ma'am, please come forward.

DEBRA LYNN CRUZ,

F3a1cruh

having been duly sworn, testified as follows:

THE COURT:  Thank you.  Ms. Cruz, you understand the circumstances under which we're meeting now.  One of the issues that I have to assess is whether or not you and your husband can ensure me that, were the defendant to be placed into your custody at home, that you could ensure his compliance with the conditions of his release.  Can you just tell me in your own words what you can and cannot do in that regard.

MRS. CRUZ:  Yes.  I can ensure that he will be in good hands.  I'm a teacher at a high school on Long Island.  I have hours approximately from 7:30 to 2:30.  It could go over 2:30.  But people understand my situation.  I've been taking days off.  I've taken yesterday off, today, I'll be taking tomorrow off, and I do have days I can take off.  But if I were to be away from home, it would basically be from 7:30 a.m. to about 2:45 p.m., and then I would make it my business to get home directly, and of course if there need to be errands, I would have to figure out how to do that.

THE COURT:  Thank you.  And you understand that one of the concerns here is that your son not have access to the internet or any other form of communications device.

MRS. CRUZ:  I do.

THE COURT:  What would you do to ensure that that does not happen?

MRS. CRUZ:  Well, if somebody wants to come to the

F3a1cruh

house, I'd either lock up the computer so nobody can use it or lock it up in the room that it is in now, with some kind of combination lock or whatever security measure would be necessary, and Jonathan would not have the combination.  Then we could leave it on.  But I doubt at this point we'll be using it that much anyway.  My husband doesn't even have a smartphone and I do, so I would make sure that I'd have it with me at all times, and if I felt that -- if I was going into the shower, since I can't go into the shower with it, I guess I would put it in my car, because he's not supposed to leave the house anyway.  I would put it somewhere where he's not supposed to be at reach.

THE COURT:  Thank you.  And can you describe the neighborhood where your house is located.  I'll tell you why I'm asking the question.

MRS. CRUZ:  Sure.

THE COURT:  I want to --

MRS. CRUZ:  It's a gated community.

THE COURT:  I want to have a sense of whether or not there will be ready access of minors or others to the home.

MRS. CRUZ:  It's a gated community, so if we were to have visitors, the security guards call us and tell us who they are and we say yes, they can come in or no.  That's what they're supposed to do, and for the most part, they do it.

THE COURT:  Okay.

F3a1cruh

MRS. CRUZ:  And I would be very -- I would tell them that with our home, they have to be extremely strict.

THE COURT:  Thank you.  And do you understand that if I do agree to impose this series of restrictions that you would be obligated to report to the court, pretrial services, if you find any infringement by your son, no matter how minor?

MRS. CRUZ:  Yes, I do.

THE COURT:  And do you understand that if he does violate any of those terms of the conditions of his release that he would be required to return to the jail?

MRS. CRUZ:  Yes, I do.

THE COURT:  Okay.  Thank you.

MRS. CRUZ:  Thank you.

THE COURT:  Mr. Cruz?

JOSÉ CRUZ,

   having been duly sworn, testified as follows:

THE COURT:  Mr. Cruz, you just heard me ask some questions of your wife.  Would you mind please explaining to me what you can do to assure me that your son would comply with the terms of his release conditions were I to release him to home incarceration in your home.

MR. CRUZ:  Well, I will work with my wife to make sure that one of us is always there.

THE COURT:  Thank you.  And are you going to be available at home?  What are your hours?

F3a1cruh

MR. CRUZ:  I have my own business, so my hours are very flexible.  I can be there if my wife can't.

THE COURT:  Thank you.  So you could be available in the home at any time that your wife was not there.

MR. CRUZ:  I would.

THE COURT:  Thank you.  And how can you ensure me that Mr. Cruz, your son, will not have access to the internet or any other kind of communications device?

MR. CRUZ:  The way that my wife has said, we would lock the computer and that we would have a combination where he has no access to it.  As my wife said before, I don't have a smartphone so that wouldn't be a problem in that case.  And if she have to leave her phone, give it to me or something like that, I'll do whatever is necessary.

THE COURT:  Thank you.  And can you provide me with assurances that under no circumstances would the defendant have contact with any minor.

MR. CRUZ:  Not under my watch, your Honor.  Absolutely not.  Not in our house.

THE COURT:  Thank you.

MR. CRUZ:  As my wife has said, it's a gated community.  There wouldn't be ways for him to have contact with any minor without us knowing.

THE COURT:  Thank you.  And do you understand that if I decide to release your son on these conditions, you would be

F3a1cruh

obligated under court order to inform the pretrial services office of any violation by your son of any of the terms of his release?

MR. CRUZ:  Yes, your Honor.

THE COURT:  Would you hesitate to do so?

MR. CRUZ:  I wouldn't hesitate one second.

THE COURT:  Okay.  All right.  Thank you.  Thank you very much.

MR. CRUZ:  Thank you, your Honor.

THE COURT:  Thank you.

Let me just note at the outset that this is a presumption case.  Because there is a presumption of detention, the defendant bears a limited burden of production -- not a burden of persuasion -- to rebut that presumption by coming forward with evidence that contradicts notions of flight risk or dangerousness.  But this does not cause the presumption to disappear; rather, it continues to be weighed with other factors affecting the decision to release or detain the defendant.  The government retains the burden of persuasion. In other words, in order for me to detain Mr. Cruz in this case, the government must persuade me, by preponderance of the evidence, that the defendant is a flight risk or, by clear and convincing evidence, that the defendant is a danger to the community.  I believe that in this case the defendant has met its burden of production by coming forward with evidence

F3a1cruh

through proffer.  The burden of persuasion, however, remains on the government as I just described.

Ultimately, under the terms of the statute 18 U.S.C. 3142, I'm allowed to detain Mr. Cruz only if I find that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of other persons and the community.  In order to make that assessment, I must consider a number of factors, as described by Ms. Crowley, pursuant to Section 3142(g).  The first of those is the nature and circumstances of the crime charged.  I can only describe them as chilling.

Second is the strength of the evidence, which is, as I understand it from the government's proffers and the complaint, very strong and, as I understand it from Ms. Crowley's description of the case, expanding in scope.

I'm also to consider the background of the defendant, including his character, physical and mental condition, family and community ties, employment, financial resources, and other elements of the defendant's personal history.  In this case I note, as commented on by defense counsel, that Mr. Cruz has strong community ties to New York City, to this region.  He has been engaged in the community.  He has lived in this area for a long time.  And I will stop with that.

With respect to the level of danger to others that the defendant's release would pose, I do not minimize at all the

F3a1cruh

danger to others that defendant's release could pose were he to be allowed to engage in the conduct of the sort that has been alleged against him.  However, as I'm going to describe, I cannot find on these facts that there is no condition or combination of conditions that will reasonably assure the appearance of the defendant and the safety of others in the community.

With respect to the flight risk, I intend to impose a package of release terms that is as comprehensive as is permitted by the Bail Reform Act.  I will describe those conditions in detail momentarily, but they will include home incarceration -- not home detention, home incarceration, meaning that the defendant will not be allowed to leave the home of his parents except for extremely limited purposes, including court appearances, meetings with counsel, and treatment, all subject to prior notification to the pretrial services officer.  It will also include electronic location monitoring, and what I intend to impose will also include a custodial arrangement involving a requirement that the defendant satisfy his term of home incarceration in the home of his parents, who will be on the scene at all times and who live in a gated community, which I understand to be an environment in which they have assured me will not permit the defendant to come into any contact with minors.

So with that, I cannot determine that there is no

F3a1cruh

condition or combination of conditions that will reasonably assure the appearance of the defendant and the safety of the other persons in the community.  Instead, I'm going to impose a series of conditions that substantially overlap those established by Magistrate Judge Peck but I'm going to supplement those conditions; I will add to them to assure the appearance of the defendant and to protect the community.

I will respond briefly to Ms. Crowley's comment regarding other defendants in other cases.  Ultimately I'm required to assess this defendant based on the proof presented in this case, and that is what I'm going to do now.

First, as Judge Peck established, the defendant will be released on a PRB of $1 million that must be cosigned by three financially responsible persons.  The following additional conditions of release will apply:

You will be subject to strict pretrial services supervision, which will include home incarceration enforced by location monitoring.

As I described earlier, the defendant will be released to the custody of his parents.  His parents have assured me that he will not violate any of the conditions of his release.  Therefore, I will also order that he remain in the custody of his parents, Mr. and Mrs. Cruz, who must agree and will agree to assume supervision and to report any violation of the release conditions to the court.  Thank you very much, Mr. and

F3a1cruh

Mrs. Cruz.  I expect you to comply with your commitment, and I understand from your appearance before me that you intend to do so, understanding the consequences for your son of your failure to do so and of course, given the nature of the allegations, the potential harm to others should you fail to do so.

Mr. Cruz's travel will be restricted to the Southern and Eastern District of New York.  He is to surrender all travel documents and may make no new applications.

I understand, as I said earlier, that Mr. Cruz is not going to be employed.  He will be incarcerated at home.

He is to have no contact with minor children or victims.

He is to accept mental health evaluation and treatment.

He may not possess, subscribe to, view any media depicting children in the nude and/or in sexually explicit positions.

He is to avoid all contact with alleged victims and potential witnesses.

He is to refrain from possessing a firearm, destructive device, or other dangerous weapon.

Most centrally, he is not to possess or use a computer, computer network, or gain internet access, including on mobile devices.  He is not to have a cellphone at all.  With respect to the computer that is currently at his parents' home,

F3a1cruh

I am going to order that it not be accessible to defendant, and I'll ask that you simply remove it from the home.  With respect to Mrs. Cruz's smartphone, it must be password locked and you must retain it in your custody at all times.

In addition, I'm going to add a bail condition of substance abuse testing and treatment.

Furthermore, I'm going to add a condition that the defendant not use alcohol at all and that he not use or unlawfully possess a narcotic drug or other controlled substance defined in 21 U.S.C. 802 unless prescribed by a licensed medical practitioner.

All of these conditions must be satisfied in full prior to Mr. Cruz's release.

I will say too that although I'm hearing this matter as the Part 1 judge today for purposes of this appeal that I will retain jurisdiction over this matter until it is wheeled out to an assigned district court judge.

Mr. Cruz, the statute requires that I release you unless I find that no condition or combination of conditions will fail to assure your appearance and the safety of the community.  You must not violate any one of these rules.  If you do and it's demonstrated to me that you have done so, you should expect that you will be back in jail at the SHU.

Is there anything else that we should discuss before I adjourn?  Ms. Crowley?

F3a1cruh

MS. CROWLEY:  Just one thing, your Honor.  Judge Peck had imposed as one of the conditions that Mr. Cruz's parents both place their property as security on the bond.

THE COURT:  Thank you very much.  I apologize for not mentioning that.

Yes, the $1 million bond must be secured, Mr. Cruz, by both your parents' home and also by your apartment.  You understand, of course, that the reason for that is that should you fail to appear or otherwise, that those assets can and will be seized.

Thank you, Ms. Crowley.

Is there anything else?

MS. CROWLEY:  Nothing from the government.

THE COURT:  Thank you very much.

MR. ZISSOU:  Judge, the magistrate judge directed that Mr. Cruz not be released until all the conditions are satisfied.  Are you continuing that order?

THE COURT:  Yes, absolutely.

MR. ZISSOU:  May I just ask one exception, Judge.  Could we have until Friday, if you will -- assuming pretrial is able to do what they have to do before that, could we have until Friday to file the confession of judgments on the properties.  We're struggling a bit to find the paperwork on Mr. Cruz's property, only because he's not sure where the shares are, so we'll have to get the keys, get in there and

F3a1cruh

figure out where they are, but if we could have till Friday to file the confession of judgment -- all other conditions, of course, must be satisfied -- I would greatly appreciate that.

THE COURT:  Thank you.  I'm going to decline that request.

Is there anything else?

MS. CROWLEY:  Nothing from the government, your Honor.

THE COURT:  Thank you very much.

MR. ZISSOU:  Thank you.

THE COURT:  We're adjourned.

THE DEPUTY CLERK:  All rise.

oOo